**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**SALVADOR PUENTE**                                                           **PLAINTIFF**

**vs.**                        **Civil Case No. 5:22-cv-05166-PKH**

**CANTRELL GAINCO GROUP, INC.;**                              **DEFENDANTS**
**JOHN DOE COMPANIES A-Z**

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

Comes now, Salvador Puente, by and through his undersigned attorneys, who brings this Complaint against Defendant Cantrell Gainco Group, Inc., and John Doe Companies A-Z, alleges and states as follows:

**I. INTRODUCTION**

1.    This personal injury/products liability lawsuit arises from a defective and unreasonably dangerous subject vacuum transport system machine for use in poultry processing plants that was designed, manufactured, and sold by Defendant Cantrell Gainco Group, Inc. ("Gainco"). The defective and unreasonably dangerous subject vacuum transport system caused catastrophic injuries and damages to Plaintiff on or about October 27, 2020. Plaintiff brings this personal injury/products liability lawsuit against Defendant pursuant to Arkansas state law seeking remedy for the damages he suffered as a result of the defective and unreasonably dangerous vacuum transport system.

**II. PARTIES**

2.    Plaintiff incorporates by reference herein the preceding paragraph as though stated word-for-word.

**A. Plaintiff**

3.      Salvador Puente is an adult resident of Springdale, Washington County, Arkansas, and he has been a resident of Arkansas at all material times referred to herein.

**B. Cantrell Gainco Group, Inc.**

4.      Defendant Cantrell is a for-profit limited liability company formed under the laws of Ohio with its principal place of business also in Ohio.

5.      At all times pertinent to this Complaint, Cantrell was and is in the business of designing, manufacturing, marketing, promoting, advertising, and selling poultry plant processing equipment and machines including the subject vacuum transport system that was being used in the feet picking portion of the Tyson plant at 600 Berry Street, Springdale, AR, and which injured Plaintiff.

6.      Specifically, Cantrell, or by and through its subsidiaries derives substantial revenues from business in Arkansas.

7.      Cantrell may be served with process in this action by delivering summons and copy of this complaint with process by serving, its registered agent in the State of Ohio where it was incorporated and is headquartered, Tim McNeil, CFO at 6801 State Route 60, Birmingham, OH 44816.

8.      Various individuals and entities not named as Defendants herein may have directly participated in the unlawful conduct alleged herein, may have performed acts and made statements in furtherance thereof or omissions, which contributed to or caused the crash. These various individuals and entities may be agents, affiliates, alter-egos, partners, or joint-ventures of the named Defendants. While actively engaged in the management, direction, or control of its affairs, each of the John Doe unknown tortfeasors

may have performed each of the acts alleged herein, or alternatively, each John Doe unknown tortfeasors authorized or ordered duly authorized officers, agents, employees, or representatives to perform said acts. These tortfeasors, upon information and belief, permitted tortious acts to be committed in Arkansas.

9.      To the extent that such John Doe tortfeasor(s) are liable for some or all of Plaintiff's damages, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery to determine the identity of said tortfeasor. Pursuant to Ark. Code Ann. § 16-56-125, Plaintiff has attached as Exhibit A an Affidavit and incorporated herein by reference to toll the statute of limitations for the wrongful actions and/or omissions alleged herein against the John Doe Companies A - Z. If a John Doe Tortfeasor is identified for one or more of the causes of action listed below, Plaintiff will amend this Complaint in accordance with Ark. Code Ann. § 16-56-125.

### III. JURISDICTION AND VENUE

10.     Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

### A.  Jurisdictional Facts

11.     This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of parties. Plaintiff also seeks more than $75,000 for damages and punitive damages.

12.     Defendant is subject to specific personal jurisdiction in this matter now before this Court.

13.     When assessing specific personal jurisdiction, the Court's first step "is to determine whether the connection between the forum and the episode-in-suit could justify

the exercise of specific jurisdiction" because courts have the "ability to hear claims against out-of-state defendants when the episode-in-suit occurred in the forum or the defendant purposefully availed itself of the forum,"[1] and this case far exceeds that threshold.

14.     The location of the episode-in-suit is the location of the personal injury regardless of where the product was manufactured or where it was first sold,[2] and that location is Arkansas.

15.     The affiliation between the Arkansas forum and the episode-in-suit warrants specific personal jurisdiction, which is properly exercised based on an "affiliation between the forum and the underlying controversy [such as] an occurrence that takes place in the forum"[3] (like the location of the product failure in this controversy) so long as the fairness factors are met.[4]

16.     When assessing specific personal jurisdiction, the Court's second step "is to consider several additional factors to assess the reasonableness of entertaining the case."[5]

17.     When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State … it has clear notice that it is subject to suit there [and if] the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises

---

1 *Daimler AG v. Bauman*, 134 S. Ct. 746, 755, 762 (2014).

2 *Goodyear Dunlop Tires Ops. v. Brown*, 131 S.Ct. 2846, 2851 (2011) ("the episode-in-suit, the bus accident, occurred in France" notwithstanding the fact that "the tire alleged to have caused the accident was manufactured and sold" in Turkey).

3 *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1780 (2017).

4 *Gibbs v. PrimeLending*, 2011 Ark. 255, 381 S.W.3d 829 (citing *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)); *John Norrell Arms, Inc. v. Higgins*, 332 Ark. 24, 962 S.W.2d 801 (1998).

5 *Daimler AG*, 134 S. Ct. at 762.

from the efforts of the manufacturer ... to serve *directly or indirectly*, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others,"[6] and this aptly describes Defendant's relationship with Arkansas.

18.     Where nonresident defendants "'purposefully derive benefit' from their interstate activities … it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities [because] the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed,"[7] and Defendant has purposefully obtained such benefits.

19.     "The placement of a product into the stream of commerce" plus "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, … advertising in the forum State [or] establishing channels for providing regular advice to customers in the forum State,"[8] and Defendant has engaged in such advertising and has established such channels of communication in Arkansas.

20.     "The stream-of-commerce cases … relate to exercises of specific jurisdiction in products liability actions, in which a nonresident defendant, acting outside the forum, places in the stream of commerce a product that ultimately causes harm inside the forum," because the "[f]low of a manufacturer's products into the forum may bolster

---

6 *See World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

7 *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74, 105 S. Ct. 2174, 2182–83 (1985).

8 *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 112, 107 S. Ct. 1026, 1032 (1987) (O'Connor, J., plurality).

an affiliation germane to *specific* jurisdiction,"[9] and this aptly characterizes the conduct by Defendant in relation to the harms at issue which Defendant has caused inside the Arkansas forum.

21.    A nonresident defendant is subject to personal jurisdiction under the Arkansas long-arm statute to the maximum extent permitted by the Due Process of Law Clause of the Fourteenth Amendment of the United States Constitution.[10]

22.    The Arkansas Supreme Court has considered three factors in determining whether due process requirements have been satisfied when personal jurisdiction has been exercised over nonresident defendants.  Those three factors[11] include:

    a.  A defendant must purposefully avail himself of privilege of acting in forum statue or causing a consequence in forum state;

    b.  Cause of action must arise from or relate to defendant's contacts with forum state; and

    c.  Acts of defendant or consequences caused by defendant must have substantial enough connection with forum state to make exercise of personal jurisdiction over defendant reasonable.

23.    As outlined in this Complaint, all three factors have been satisfied for the nonresident Defendant in this action.

24.    Furthermore, there is no burden on Defendant to litigate this civil action in the Arkansas forum where the personal injury occurred.

25.    Arkansas has an interest in adjudicating this dispute which occurred in Arkansas, which involved the assessment of conduct that occurred in Arkansas as well

---

9 *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2849 (2011) (emphasis in original).

10 A.C.A. § 16-4-101.

11  *Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84; 569 S.W.3d 865 (2019).

as products which failed in Arkansas, and which catastrophically injured an Arkansas resident.

26. Plaintiff's interest in obtaining convenient and effective relief militates in favor of litigating in the Arkansas forum where the witnesses to the failure and the witnesses to the immediate post-failure treatments and investigation are located.

27. The interstate judicial system's interest in obtaining the most efficient resolution of controversies warrants litigating this case in Arkansas where the defective products at issue failed, where the personal injury occurred, and where the victim resided.

28. Further, the shared interest of the several States in furthering fundamental substantive social policies warrants litigating this case in Arkansas where the defective products at issue failed, where the personal injury occurred, and where the victim resided.

29. Defendant developed, designed, tested, manufactured, assembled, inspected, marketed, distributed, sold, and placed into the stream of commerce the subject vacuum transport system involved in the personal injury at issue, which caused catastrophic injuries to Plaintiff.

30. The exercise of specific personal jurisdiction over Defendant pursuant to the Arkansas long-arm statute is consistent with the Due Process Clause and the principles of fundamental fairness by virtue of Defendant's doing business in Arkansas.

31. Defendant committed the torts at issue in this case where the causation of damages is an element of the tort and that element occurred in Arkansas.[12]

---

[12] A necessary element of the strict liability torts asserted against Defendant in this civil action requires proof that the defect in Defendant's machine contributed to causing "plaintiff's injuries or damages." *Nationwide Rentals Co., Inc. v. Carter*, 298 Ark. 97, 765 S.W.2d 931 (1989). In this case, the causation-of-damages element occurred in Arkansas. Another essential element of any products liability case is that the defendant "was engaged in the business of manufacturing, assembling, selling, leasing, or distributing the product." *Pilcher v. Suttle Equipment Co.*, 365 Ark. 1, 223 S.W.3d 789 (2006).

32.   Defendant engaged in such continuous, systematic behavior in Arkansas, and Defendant continually conducts business in Arkansas such that Defendant is "at home" in Arkansas.

33.   Defendant, on information and belief, sells its machines to numerous poultry processing facilities in Arkansas.

34.   On information and belief, Defendant actively engages in the promotion and use of its products in Arkansas.

35.   On information and belief, Defendant continuously advertises, markets, distributes, and sells its products inside of Arkansas, and derives profit from its businesses due to transactions in Arkansas.

36.   Defendant purposefully avails itself of the privilege and opportunity to conduct business in Arkansas.

37.   Defendant's sale of the subject Vacuum Transport System and the component parts are not simply an isolated occurrence, but arise from Defendant's efforts to serve, directly and indirectly, the market for specific products in Arkansas and the 49 other states.

38.   It is reasonable to subject the Defendant to suit in Arkansas because the defective Vacuum Transport System and the component parts have been the source of injury to the Plaintiff in Arkansas.

39.   Because Defendant purposefully derives benefit from its interstate activities, it would be unfair to allow Defendant to escape having to account in Arkansas for consequences that arise proximately from Defendant's interstate activities.

40.     Allowing Defendant to escape jurisdiction would improperly allow the Defendant to wield the Due Process Clause as a territorial shield to avoid interstate obligations that Defendant has voluntarily assumed.

41.     In addition to placing the subject Vacuum Transport System and the component parts into the stream of commerce, on information and belief, Defendant has shown an intent to serve the market in Arkansas by engaging in the additional conduct of advertising in Arkansas.

42.     Defendant placed in the stream of commerce the subject Vacuum Transport System and the component parts, which ultimately caused harm inside Arkansas because of the flow of Defendant's products into Arkansas.

43.     Defendant's contacts with Arkansas include the sale of machinery and equipment for use in poultry processing plants, as well as other meat and animal product processing operations, such as those referenced here, but not limited to that sole product.

44.     Defendant has reaped profits from the sale of its products, including the subject Vacuum Transport System and its component parts, in Arkansas.

**B.  Venue**

45.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because (1) Plaintiff resides in this District; (2) Defendant has engaged in substantial conduct and business relevant to Plaintiff's claims within this District; and (3) Plaintiff has suffered substantial losses due to Defendant's wrongful conduct within this District.

## IV. FACTUAL ALLEGATIONS

46.     On or about October 27, 2020, Plaintiff was an employee working in the maintenance department of the Tyson Chicken Plant at 600 Berry Street, Springdale, Arkansas in Washington County.

47.     As part of Plaintiff's work, he and his other maintenance department members performed general day-to-day maintenance and repair on the various machines and equipment within the facility.

48.     Defendant Cantrell designed, manufactured, and sold vacuum transport system, which was sold and delivered to Plaintiff's employer in Springdale, Arkansas at some date prior to Plaintiff's injuries on October 27, 2020.

49.     Defendant Cantrell designed, manufactured, and sold a vacuum transport system that was made for moving chicken feet parts throughout a plant after they were pulled from the chickens' legs by another machine in the area.

50.     Below is a picture of an exemplar part of a vacuum transport system taken from Cantrell's website[13]:

---

13 Please see https://cantrellgainco.com/equipment/vacuum-transport-systems last accessed on August 9, 2022.



51.     The subject Cantrell Vacuum Transport System and/or the component parts were defectively designed, manufactured, and marketed.

52.     During the day of October 27, 2020, Plaintiff was at work in the Tyson plant.

53.     The subject Cantrell vacuum transport system was experiencing clogging with chicken feet that was interrupting the production work within the plant.

54.     Plaintiff and his co-workers in the maintenance department were called upon to work on the subject vacuum transport system to clean out the clog while attempting to determine what had been causing repeated clogging and try to remedy the situation to allow for uninterrupted work in the plant.

55.     Before Plaintiff began to work on the subject vacuum transport system, he and his coworkers disconnected it from both the electrical and pneumatic supply systems that cause the system to operate, so that they could safely work on the machine without it moving. This was done by fully unplugging the electrical connection and disconnecting the air hoses going both into, and out of, the machine. The electrical and pneumatic supply connections were not located directly on or in the very near vicinity of the machine, and not within their sight while they were working on the machine.

56.     When Plaintiff had his right (dominant) hand inside the machine, it suddenly started back up again, slamming closed and violently crushing and degloving his hand.

57.     Unbeknownst to Plaintiff and his coworkers who were working with him on the vacuum transport system, another person out of their sight happened upon the unplugged and disconnected vacuum transport system and plugged it back in without knowing that Plaintiff and other coworkers were in the process of working on the machine and thus in danger if it were to start back up.

58.     Plaintiff ultimately suffered amputation of his hand due to intractable infection suffered in the wounds on his hands due to the contamination of chicken parts inside the machine that crushed his hand.

59.     The subject vacuum transport system was defective and unreasonably dangerous by its failure to incorporate a lockout-tagout design feature allowing it to be disabled by workers to be able to safely service the machine and have certainty that it was both disabled and could not be re-engaged by someone else unaware of the danger. Such lockout-tagout features are in common use on other machinery and incorporate a padlocking mechanism allowing workers like Plaintiff to lockout the power supply and take

the key with them so it cannot be altered by anyone, and many are also located within easy sight from where workers foreseeably will be when servicing the machine to allow for visual confirmation that they are safe and continue to be safe during their work.

60.     The clogging suffered by the subject vacuum transport system is a foreseeable and common part of its normal operation, as is the service work required to clean out and remedy such clogs, thus requiring workers to come into contact with the moving portions of the machine on a fairly regular basis to service it.

61.     The failure of the subject vacuum transport system to incorporate an appropriate lockout-tagout feature in its design, was a producing and proximate cause of the grievous injuries, excruciating medical procedures and treatment therefore, and other attendant losses and damages suffered by Plaintiff.

### V. CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION – STRICT LIABILITY PURSUANT TO ARK. CODE ANN. §16-116-101, *et seq.* – ARKANSAS PRODUCTS LIABILITY ACT AGAINST

62.     Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

63.     At all times material to this action, the Defendant Cantrell was in the business of designing, engineering, developing, testing, approving, manufacturing, fabricating, assembling, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, wholesaling, selling, and supplying machinery for use in the meat processing industry, including poultry processing plants like the Tyson plant where Plaintiff was injured, including the subject vacuum transport system and its various component parts, throughout the United States, including Arkansas.

64.     Defendant Cantrell designed, engineered, developed, tested, approved, manufactured, fabricated, assembled, equipped, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, sold, supplied, and placed into the stream of commerce a defective and unreasonably dangerous product, *i.e.* the subject vacuum transport system and component parts, which is the subject of this Complaint.

65.     Upon information and belief, the subject vacuum transport system and component parts, which is the subject of this Complaint, were expected to, and did, reach the user and/or consumer without substantial change in the condition in which they were sold and were, at the time of the event, in essentially the same condition as when they left the hands of Defendant. However, even if the subject vacuum transport system and component parts had been altered in some fashion before causing catastrophic injuries and damages to Plaintiff, the substitution of alternative component parts is well-known and foreseeable to Defendant.

66.     As stated in several particulars previously, the subject vacuum transport system and component parts as designed and manufactured by the Defendant was in a defective condition and unreasonably dangerous to foreseeable users, including Plaintiff.

67.     Defendant was aware that the subject vacuum transport system and component parts, as designed, manufactured, and sold were defective and unreasonably dangerous, and that safer alternative designs were and are feasible and available.

68.     The safer alternative designs would have prevented or significantly reduced the risk of the accident and the injuries and damages occurred in this case without substantially impairing the product's utility.

69.     Furthermore, the safer alternative designs were economically and

technologically feasible at the time the product left the control of Defendant by the application of existing and reasonably achievable scientific knowledge.

70.    The defects and dangers of the subject vacuum transport system and component parts, which is the subject of this Complaint, were unknown to Plaintiff.

71.    At the time the subject vacuum transport system and component parts left the control of the Defendant, they were defective in design and manufacture, and they were unreasonably dangerous to a person who might reasonably be expected to use them. These defects include, but are not limited to, the conditions described in the following subparagraphs:

   a.    The subject vacuum transport system and component parts lacked an appropriate lockout-tagout design feature and sufficient warnings and instructions about the risks, dangers, and harms and reasonable means to reduce such risks, dangers and harms.

   b.    The subject vacuum transport system and component parts were unsafe in its design and manufacture.

   c.    Defendant had a duty to warn those who may come into contact with the subject vacuum transport system and component parts of the risks or defects that were known or reasonably should have been known, including but not necessarily limited to the risks posed by the stems failing. Defendant failed to warn Plaintiff of the defects or dangers inherent to its product, which was a proximate cause of the catastrophic injuries to Plaintiff.

   d.    Defendant had a duty to use ordinary care in the design, manufacture, assembly, testing, inspection and sale of the subject vacuum transport system and component parts that is the subject of this Complaint so that it could be safely used for the purpose it was made. Defendant negligently and carelessly failed to properly design, manufacture, assemble, test and inspect the vacuum transport system and component parts, which, as a proximate result thereof, caused the catastrophic injuries to Plaintiff.  Specifically, Defendant failed to warn Plaintiff and others similarly situated about the dangers of

working on the machine even after taking appropriate steps to protect themselves by disabling both the air and power supplies to the machine.

e.  The design of the subject vacuum transport system and component parts were inadequate to protect and/or prevent users from suffering serious injuries during foreseeable use.

72.     As a direct and proximate result of the defective and unreasonably dangerous condition of the vacuum transport system and component parts, Plaintiff suffered life-altering catastrophic injuries and damages.

73.     Defendant is strictly liable for all damages proximately caused by the defective and unreasonably dangerous condition of the subject vacuum transport system and component parts, as described in this Complaint. Defendant is strictly liable for all damages proximately caused by the inadequacies in the design and manufacture of the subject vacuum transport system and component parts. The damages Plaintiff suffered, *inter alia,* severe and permanent injuries, the loss of use of his right (dominant) hand, scarring and disfigurement, past, present, and future medical expenses, conscious physical and emotional pain, suffering, and mental anguish, and other damages in excess of the amount required for federal diversity jurisdiction.

## B. SECOND CAUSE OF ACTION – NEGLIGENCE

74.     Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

75.     Defendant had a duty to properly and safely design, test, manufacture, maintain, and inspect the subject vacuum transport system and component parts.

76.     Defendant had a duty to place a reasonably safe product in the stream of commerce.

77.     Upon information and belief, the subject vacuum transport system and component parts were expected to, and did, reach the user and/or consumer without substantial change in the condition in which they were sold and were, at the time of the original sale, delivery, and installation, in essentially the same condition as when they left the hands of the Defendant. However, even if the subject vacuum transport system and component parts had been altered in some fashion before causing damages to Plaintiff, the substitution of alternative component parts is well-known and foreseeable to Defendant.

78.     Defendant knew or should have known that the subject vacuum transport system and component parts were inherently dangerous and were defective as previously set forth herein.

79.     Defendant had a duty to warn Plaintiff as to any defects of the subject vacuum transport system and component parts.

80.     Defendant violated its duties and was careless, negligent, grossly negligent, reckless, willful, and wanton, in the following particulars:

  i. In designing, manufacturing, and placing into commerce an unsafe subject vacuum transport system and component parts;

  ii. In failing to properly and adequately design, test, and manufacture the subject vacuum transport system and component parts;

  iii. In failing to design, manufacture, and sell a safe vacuum transport system and component parts, despite the fact that safer alternative designs were technologically and economically feasible;

  iv. In failing to have discovered that the subject vacuum transport system and component parts were defective;

v.      In failing to properly inspect, maintain, and assemble the subject vacuum transport system and component parts;

vi.     In allowing a defective and/or inherently dangerous subject vacuum transport system and component parts to be used;

vii.    In placing the defective and unsafe vacuum transport system and component parts into the stream of commerce without adequate warnings, while knowing that the products would be sold to and used by persons in the industry, thereby exposing them and other third parties in the vicinity to a high and unreasonable risk of injury without adequate warnings; and

viii.   In failing to create and provide sufficient warnings as to the dangerous propensities of the vacuum transport system and component parts to the end-user.

81.    As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness, willfulness, and wantonness of Defendant, Plaintiff was severely damaged and is entitled to an award of actual and consequential damages as previously set forth herein.

82.    Defendant's conduct in designing, manufacturing, and placing an inherently dangerous product, with a known and serious risk of harm, into the stream of commerce was reckless, willful, wanton, heedless, and in flagrant disregard to public safety. As a result, Plaintiff is entitled to recover punitive and/or exemplary damages in an amount to be determined by the trier of fact.

### C. THIRD CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

83.    Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

84.    A seller impliedly warrants that a product is merchantable at the time the product is sold. To be merchantable, a product must be fit for the ordinary purposes for which the product is used, and the product must be adequately labeled and must conform

to any promises or affirmations of fact made on the container or label.

85.     Plaintiff has sustained damaged due to Defendant's unsafe, defective, and inherently dangerous machine, which is the subject vacuum transport system and component parts.

86.     Defendant sold the subject vacuum transport system, which was not merchantable in that the product as designed posed an unsafe and inherent risk to users who would foreseeably be working on and servicing this machine.

87.     The unfitness of Defendant's product was a proximate cause of damages to Plaintiff. Plaintiff is a person whom the Defendant would have reasonably expected to be affected by the Defendant's unsafe, defective, and inherently dangerous machine

88.     Defendant has been notified of the breach of this warranty.

### D. FOURTH CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

89.     Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

90.     The defective and dangerous condition of the subject vacuum transport system and component parts, and lack of adequate warnings, made it unfit for use as a poultry processing machine generally, and unfit for the particular purpose as an poultry processing plan vacuum transport system, specifically.

91.     Upon information and belief, the subject vacuum transport system and component parts were expected to, and did, reach the user and/or consumer without substantial change in the condition in which they were sold and were, at the time of the event, in essentially the same condition as when they left the hands of Defendant. However, even if the subject vacuum transport system and component parts had been

altered in some fashion before causing injury to Plaintiff, the substitution of alternative component parts is well-known and foreseeable to Defendant.

92.    Defendant knew that purchasers and users would be relying on Defendant's skill and judgment to select and furnish a suitable machine for their use.

93.    Plaintiff is a third party who would foreseeably use and/or be affected by the subject vacuum transport system and component parts.

94.    The Arkansas Code Annotated and almost every other states' Uniform Commercial Code implies warranties of merchantability and fitness for a particular purpose in the sale (§§ 4-2-314, 4-2-315) and leasing (§§ 4-2A-212, 4-2A-213) of goods, including machines like the one that is the subject of this Complaint.

95.    Defendant breached those implied warranties by selling a defective vacuum transport system and component parts that violated the warranties of merchantability and fitness for a particular purpose.

96.    As a direct and proximate result of Defendant's breach of warranties and pursuant to § 4-2-715 and § 4-2A-520, Plaintiff was catastrophically injured, and Plaintiff is entitled to an award of actual and consequential damages as previously set forth herein.

97.    Defendant has been notified of the breach of this warranty.

### E. FIFTH CAUSE OF ACTION – FAILURE TO WARN

98.    Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

99.    At all relevant times, Defendant had a duty to exercise reasonable care in designing and testing the vacuum transport system and component parts.

100.    At all relevant times, the Defendant had a duty to properly warn consumers

of the risks, dangers, and harms presented by the vacuum transport system and component parts.

101.    At all relevant times, Defendant had reasonable means to reduce such risks, dangers and harms presented by the vacuum transport system and component parts.

102.    Defendant negligently designed, engineered, developed, tested, approved, manufactured, fabricated, assembled, equipped, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, sold, and supplied the vacuum transport system and component parts, in that they failed to exercise reasonable care to prevent the vacuum transport system and component parts from creating an unreasonable risk of harm to a person who might reasonably be expected to use it in an expected or reasonably foreseeable manner. Defendant thereby breached its various duties set forth in this Count.

103.    Defendant's acts of negligence include but are not limited to the following:

a.  Defendant engaged in inadequate testing of the vacuum transport system and component parts and similar machines;

b.  Defendant failed to design, test, and manufacture the subject vacuum transport system and component parts to ensure that it would not pose an unreasonable risk of serious harm to Plaintiff and others like him in foreseeable and expected uses;

c.  Defendant failed to provide adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the subject vacuum transport system and component parts; and

d.  Defendant failed to provide reasonable means to reduce such risks, dangers, and harms presented by the subject vacuum transport system and component parts.

104.    Upon information and belief, the subject vacuum transport system and

component parts were expected to, and did, reach the user and/or consumer without substantial change in the condition in which they were sold and were, at the time of Plaintiff's injuries, in essentially the same condition as when they left the hands of Defendant. However, even if the subject vacuum transport system and component parts had been altered in some fashion before causing damages to Plaintiff, the substitution of alternative component parts is well-known and foreseeable to Defendant.

105.   Defendant had a duty to provide adequate warnings and information to foreseeable users, such as Plaintiff, about the dangers of the design and use of the subject vacuum transport system and component parts.

106.   As a direct and proximate result of Defendant's failure to warn, Plaintiff sustained serious damages as previously set forth herein, and he is entitled to an award of actual damages in an amount to be determined by the trier of fact.

107.   Defendant's failure to warn users and consumers of a known and serious risk of harm from the use of its machine was reckless, willful, wanton, heedless, and in flagrant disregard to public safety.  As a result, Plaintiff is entitled to recover punitive and/or exemplary damages in an amount to be determined by the trier of fact.

**F. SIXTH CAUSE OF ACTION – GROSS NEGLIGENCE**

108.   Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

109.   The wrong done by Defendant was aggravated by the kind of gross negligence, malice, and callous disregard for which the law allows the imposition of exemplary and punitive damages.

110.   The conduct of Defendant, when viewed objectively from the Defendant's

standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendant was actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare to others.

111.    Defendant's acts of omission and commission, which collectively and severally constituted gross negligence, were a proximate cause of Plaintiff's injuries and damages.

## VI. CAUSATION OF THE LIFE-ALTERING CATASTROPHIC INJURIES AND DAMAGES TO PLAINTIFF

112.    Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

113.    The injuries and damages sustained by Plaintiff individually more particularly described below, were produced in a natural and continuous sequence from Defendant's violations of one or more of the above-described independent duties to use ordinary care for the safety of Plaintiff.

114.    The injuries and damages sustained by Plaintiff were a probable consequence from Defendant's violations of one or more of the above-described independent duties to use ordinary care for the safety of Plaintiff.

115.    Defendant should have foreseen and anticipated that a violation of one or more of the above-described independent duties to use ordinary care would constitute an appreciable risk of harm to others, including Plaintiff.

116.    If Defendant had not violated one or more of the above-described independent duties to use ordinary care for the safety of Plaintiff, then the life-altering and catastrophic injuries and damages to Plaintiff would not have occurred.

## VII. COMPENSATORY DAMAGES SUSTAINED BY PLAINTIFF

117.    Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

118.    The injuries and damages sustained by Plaintiff as a result of Defendant's violations of one or more of the above-described independent duties to use ordinary care, include, but are not limited to, the following:

> a.  Serious and permanent bodily injuries to Plaintiff's body, including, but not limited to, the loss of his right and injuries to his right forearm, which is a life-changing event causing Plaintiff to lose the ability to enjoy a normal quality of life;
>
> b.  Medical expenses incurred in the past and reasonably expected to be incurred in the future, and transportation expenses to obtain such medical treatment;
>
> c.  Physical pain and suffering experienced in the past and reasonably expected to be experienced in the future;
>
> d.  Mental anguish experienced in the past and reasonably expected to be experienced in the future, which includes, but is not limited to, Plaintiff's loss of quality of life due to permanent injuries causing chronic pain that limits his activities;
>
> e.  The loss of wages and income in the past and reasonably expected to be experienced in the future;
>
> f.  The present value of the loss of ability to earn in the future, suffered as a result of Plaintiff's permanent bodily injuries and related limitations;
>
> g.  The scarring, disfigurement, and visible results of his injuries; and
>
> h.  The reasonable expense of any necessary help in Plaintiff's home in the past, and reasonably certain to be required in the future, as a result of Plaintiff's injuries.

## VIII. AMOUNT OF DAMAGES

119.    Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

120.    The damages alleged in this case are in excess of the minimum amount required for federal court jurisdiction in diversity of citizenship cases, for which Plaintiff should be awarded a judgment as against Defendant in an amount to fully and fairly compensate him for each and every element of damages that has been suffered.

## IX. PUNITIVE DAMAGES

121.    Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

122.    Plaintiff is entitled to recover punitive damages in accordance with Arkansas law, based upon Defendant's complete indifference to and conscious disregard for the safety of Plaintiff and others, causing or contributing to catastrophic and permanent injuries. Defendant's wanton and reckless acts and omissions occurred under circumstances where its conduct, in total disregard of the consequences, would naturally and probably result in injury or damages to Plaintiff. Defendant knew or should have known, in light of the surrounding circumstances, that its conduct would naturally and probably result in catastrophic and serious injury, and they continued this conduct with malice and wanton and reckless disregard for the consequences of its actions for which punitive damages should be awarded.

123.    In addition to actual, special, consequential and compensatory damages, Plaintiff demands a judgment against Defendant for punitive damages in an amount necessary and sufficient to deter the Defendant from the above-described conduct and

to punish the Defendant for its willful, wanton, gross, flagrant, reckless, outrageous, and egregious conduct.

## X. DEMAND FOR JURY TRIAL

124.   Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

125.   Plaintiff demands a jury trial for all issues of fact presented by this action.

## XI. RESERVATION OF ADDITIONAL CLAIMS

126.   Plaintiff incorporates by reference herein the preceding paragraphs as though stated word-for-word.

127.   Plaintiff reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiff prays that after a jury trial of this action that he be awarded the following:

A.   A judgment against Defendant in such an amount that will fully and fairly compensate him for all of the above-described damages and in an amount in excess of that required for federal court jurisdiction in diversity of citizenship cases;

B.   A judgment and verdict against Defendant awarding exemplar or punitive damages as permitted by law;

C.   All costs expended herein including attorneys' fees and any expert costs and fees as permitted by law;

D.   A pre- and post-judgment interest award against Defendant to compensate for loss of money and to the extent of and for the reasons permitted by law; and

E.   All other proper relief to which he may be entitled in the premises.

Respectfully Submitted,

Joseph Gates, Bar No. 2010239
**Gates Law Firm, PLLC**
2725 Cantrell Road, Suite 105
Little Rock, AR 72202
Phone: (501) 779-8091
Fax: (479) 269-9788
Email: Gates@GatesLawPLLC.com

By: _____
Joseph Gates

And

Benjamin C. Fields, *pro hac vice pending*
Missouri Bar No. 58054
**Fields Law Firm, LLC**
1600 Genessee Street, Suite 860
Kansas City, Missouri 64102
Telephone:  816-659-9970
Facsimile:   816-659-9969
ben@fieldslawkc.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**SALVADOR PUENTE**                                                  **PLAINTIFF**

**vs.**                          **Civil Case No. 5:22-cv-05166-PKH**

**CANTRELL GAINCO GROUP, INC.;**                      **DEFENDANTS**
**JOHN DOE COMPANIES A-Z**

### <u>AFFIDAVIT OF UNKNOWN TORTFEASOR</u>

I, Joseph Gates, first being duly sworn under oath, pursuant to Ark. Code Ann. §

16-56-125, for my John/Jane Doe Affidavit, states of personal knowledge as follows:

1.      I am Joseph Gates, counsel of record for Plaintiff, Salvador Puente,

regarding his Complaint filed in the above-styled case.

2.      I am licensed to practice law in the State of Arkansas and the Eastern and

the Western Districts of Arkansas and to represent the Plaintiff in this district court matter.

My Arkansas Bar Association Number is 2010239.

3.      In the underlying action, Plaintiff alleges various causes of action against

the Defendants arising out of an incident occurring on or about October 27, 2020.

4.      As of the date of filing this Complaint, I have been unable to identify with

due diligence, based upon the available facts and information, additional tortfeasors who

might be rightfully included in one or more causes of action listed in this Complaint, or

who may be liable for some or all of Plaintiff's damages that are not named parties and

thereby be brought into the lawsuit by Third-Party or other pleading as provided by the

Federal Rules of Civil Procedure and Arkansas law.

5.      Counsel has a good-faith belief that such additional tortfeasors may exist

and anticipates that the discovery process and further identification of facts not yet known

Page **1** of **2**



PLAINTIFF'S
EXHIBIT

**A**

or discoverable by public information will yield the identify of additional tortfeasors.

6.    In order to protect the Plaintiff's interest, it is necessary to include allegations against unknown tortfeasors in this Complaint.

7.    I have included Defendants as "John Doe Companies A-Z" in this Complaint, and I will supplement with the correct information when and if it becomes available.

*Further Affiant Sayeth Not.*

Executed this __9th__ day of August, 2022.

_____
Joseph Gates

## ACKNOWLEDGMENT

STATE OF ARKANSAS            )
                             )
COUNTY OF PULASKI            )

ON THIS __9__ DAY of AUGUST, 2022, the above-named affiant, well and truly known to me, a Notary Public, executed the foregoing document for the purposes and upon the premises set forth herein.

_____
Notary Public

My Commission Expires:

7-13-2032

KRISTEN SPIGNER
Notary Public - Arkansas
Pulaski County
Commission # 12719507
My Commission Expires Jul 13, 2032